# IN THE SUPREME COURT OF PENNSYLVANIA
## MIDDLE DISTRICT

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 41 MAP 2016 |
| | : | |
| Appellee | : | Appeal from the Order of the Superior |
| | : | Court dated July 17, 2015 at No. 1693 |
| | : | MDA 2014 Affirming the Order of the |
| v. | : | Dauphin County Court of Common |
| | : | Pleas dated October 1, 2014 at No. CP- |
| | : | 22-CR-0003601-2014. |
| DAVID EDWARD RICKER, | : | |
| | : | ARGUED:  December 6, 2016 |
| Appellant | : | |

## DISSENTING STATEMENT

**JUSTICE WECHT**                                    **FILED:  September 28, 2017**

The Court dismisses this appeal as improvidently granted, because a majority of Justices now have concluded that the case presents a poor vehicle by which to review the use of hearsay evidence at preliminary hearings.  The Court has determined that, because the Commonwealth introduced *some* non-hearsay evidence at David Ricker's preliminary hearing, we should await a case in which the issue is more suitably presented.  I respectfully disagree.

The Commonwealth's *prima facie* case was premised upon, and, for all practical purposes constructed entirely by, Trooper Michael Trotta's taped interview.  At the preliminary hearing, the crux of the prosecution's case was inadmissible hearsay.  It is true that the Commonwealth presented live, non-hearsay testimony from Trooper Douglas Kelley.  But this testimony was tangential; it merely corroborated elements of what the Commonwealth sought to prove through introduction of Trooper Trotta's taped interview.  It also is true that Trooper Kelley's testimony *could* have established one or

more elements in one or more of the three crimes for which David Ricker was charged. But that is not what happened.

At the preliminary hearing, Trooper Trotta's taped statement was the Commonwealth's proverbial star witness. Trooper Trotta's statement left no gaps to be filled in with other evidence. The non-hearsay testimony was surplusage.[1] Of course, it was well within the Commonwealth's discretion to introduce Trooper Kelley's testimony. However, while that testimony *could* have established some elements of the offenses, it is plain that it did not do so. From my review of the record, I fail to discern how we reasonably can conclude otherwise. The *prima facie* case was established exclusively by Trooper Trotta's taped interview. The fact that the Commonwealth introduced other material does not change this reality.

Perhaps the Court is correct that this case does not offer the optimal vehicle for analyzing the issue. Nonetheless, I believe that it is imprudent for us to decline review here. The question presented is "one of such substantial public importance as to require prompt and definitive resolution by the Pennsylvania Supreme Court." *See*

---

[1] Chief Justice Saylor criticizes my characterization of Trooper Kelley's testimony, and highlights the lack of authority to support what he perceives as my effort to "downplay" or "subordinate" that non-hearsay evidence. *See* Concurring Statement at 15-16 n.8. This criticism misconstrues my point. I neither make, nor intend, any argument to "downplay" (or "up-play") any evidence. What I *am* doing is simply viewing the preliminary hearing, and the Commonwealth's clear objective at that hearing, in a realistic manner in light of what is plain from the record. My review of that record makes patently clear that the Commonwealth sought to establish its *prima facie* case through Trooper Trotta's taped statement. The remainder of the evidence (*i.e.* Trooper Kelley's testimony) was used merely to bolster that hearsay evidence, and to corroborate it, but quite obviously not to establish any elements on its own. To view the matter otherwise, as the learned Chief Justice does, elevates the non-hearsay to a level unintended by the Commonwealth and presses it into service now in a manner belied by the record of how the hearing actually occurred. The result allows the Commonwealth to insulate its case from meaningful challenge by a defendant and prevents this Court from considering the constitutionality of a hearing conducted in the fashion that occurred here.

Pa.R.A.P.1114(b)(4). While this provision of our rules guides our decisions on whether to grant review in a case, its principle is equally compelling when we consider whether to dismiss an appeal as improvidently granted. Thousands of preliminary hearings occur across this Commonwealth each year. Query: How will those proceedings be conducted and governed, and for how long, until the very best vehicle arrives at this Court for review? To the extent that the Superior Court erred in this case, and I believe that it did, its error will be replicated and imposed upon every defendant in this Commonwealth until the best case arrives on our doorstep. The issue is adequately preserved and presented, and should not be left on a back burner to await resolution at some unknown point in the future.

The Superior Court's decision here permits *prima facie* cases to be built exclusively upon hearsay. Consider the consequences of that decision, which will continue, and which may be exacerbated, as we await the best case. Magisterial district judges will be unable to fulfill their essential role of determining whether the Commonwealth has presented enough evidence to detain the accused. Defendants will be subjected to extensive periods of pretrial incarceration that later may prove to have been unnecessary. Neither the Commonwealth nor the defendant will gain a fair assessment of the strength of the case going forward. The defendant will be stripped of a fair opportunity to test the Commonwealth's case via his or her rule-based right to cross-examination, to direct his or her pretrial investigation, to exercise his or her constitutional right to an attorney in a meaningful fashion, and to consider intelligently his or her options to plead guilty or to proceed with a jury trial or a non-jury trial.

And there is a still larger problem that follows from the Court's dismissal. Not only will the Superior Court's decision fundamentally alter the preliminary hearing; as well, today's result effectively hands the Commonwealth a blueprint for ensuring that

cases are constructed in such a way as to perpetually avoid review of the question presented in this case. Henceforth, the Commonwealth can present inadmissible hearsay to establish every element of every crime charged. The Commonwealth then can call one live witness to testify as to any tangential, corroborative fact, no matter how obvious or duplicative. For instance, in a murder case, the Commonwealth can call one police officer to say that he or she saw the victim's corpse in the morgue, even though this fact was already established through hearsay. So long as that one additional fact *could* touch upon or establish any element of the crimes charged, the *prima facie* question will forever be able to avoid our review, and the Superior Court's decision will remain the law of this Commonwealth, escaping our consideration in perpetuity.

Its facial appeal notwithstanding, the Court's decision necessarily induces these unfortunate results. Accordingly, I respectfully dissent. I would review the merits of the case, and I would reverse the Superior Court. My analysis follows.

**I.**

In a criminal prosecution, the preliminary hearing is the first event at which the right to counsel attaches. *Coleman v. Alabama*, 399 U.S. 1, 9-10 (1970) (plurality). It is the proceeding at which the Commonwealth must carry its first burden. The preliminary hearing is no mere formality. It is important to both the Commonwealth and the defendant. The preliminary hearing is essential to the functioning of a justice system that seeks to balance the Commonwealth's authority and obligation to prosecute crime against the accused's individual rights under our Constitutions.

At the preliminary hearing, the Commonwealth must appear before a neutral and detached magistrate and justify restraints of a person's liberty—restraints imposed by pretrial incarceration, by requiring a person to defend against criminal charges, or both. The Commonwealth must justify such restraints by establishing a *prima facie* case to

the judicial officer's satisfaction. *See* Pa.R.Crim.P. 542(D). Although the burden is relatively low, it is nonetheless vital to our system of justice.

The question in this case is whether the Commonwealth can satisfy that burden on the basis of inadmissible hearsay evidence alone. The Superior Court decided that it may do so, concluding that Pa.R.Crim.P. 542(E) countenances a *prima facie* case established under such circumstances. This interpretation runs afoul of our constitutional requirements of due process and fundamental fairness. It is unsustainable, as a matter of law.

## II.

The vast majority of criminal cases begin with the filing of a criminal complaint against an individual suspected of committing one or more criminal offenses. In most instances, the district attorney plays no part in the initial charging decision, which is made by a law enforcement officer. Nor does the prosecutor typically appear at the initial arraignment. Normally, the attorney for the Commonwealth involves himself or herself in a case for the first time at the preliminary hearing.

Rule 542 of the Pennsylvania Rules of Criminal Procedure governs those hearings. The rule, *inter alia*, authorizes the Commonwealth to "assume charge of the prosecution," and to "recommend to the issuing authority that the defendant be discharged or bound over to court." Pa.R.Crim.P. 542(A)(1)-(2). The rule also safeguards certain rights held by the defendant, including the right to "be represented by counsel" and to "cross-examine witnesses and inspect physical evidence offered against" him or her. *Id.* 542(C)(1)-(2). The defendant may call witnesses and offer physical evidence on his or her own behalf. *Id.* 542(C)(3)-(4).

The rule also sets forth the Commonwealth's burden of proof, mandating that an issuing authority may hold a defendant for trial only when the Commonwealth

establishes a *prima facie* case demonstrating that "(1) an offense has been committed and (2) the defendant has committed it."  *Id.* 542(D).  Finally, the rule authorizes the Commonwealth to satisfy this burden, at least in part, through the use of hearsay.  Rule 542(E) provides as follows:

> Hearsay as provided by law shall be considered by the issuing authority in determining whether a *prima facie* case has been established.  Hearsay evidence shall be sufficient to establish **any** element of an offense, including, but not limited to, those requiring proof of the ownership of, non-permitted use of, damage to, or value of property.

*Id.* 542(E) (boldface added for emphasis).

In this case, the Superior Court interpreted "any" to mean, effectively, one element, some elements, or all of the elements of a crime.  The court opined that, "[i]f hearsay evidence is sufficient to establish one or more elements of the crime, it follows that under the rule, it is sufficient to meet all of the elements."  *Commonwealth v. Ricker*, 120 A.3d 349, 357 (Pa. Super. 2015).  Thus, concluded the Superior Court, Rule 542(E) permits the Commonwealth to establish a *prima facie* case premised exclusively upon hearsay evidence, even though that same body of evidence would not be admissible at a later trial.

**III.**

Like the Superior Court, we must interpret the term "any" as it appears in Rule 542(E).  In all matters involving statutory interpretation, we apply the Statutory Construction Act, 1 Pa.C.S. §§ 1501 *et seq.*  The Act directs us to ascertain and effectuate the intent of the drafter of the relevant provision.  1 Pa.C.S. § 1921(a).[2]  To accomplish that goal, we interpret the operative language not in isolation, but with

---

[2]   Generally, our rules of procedure are subject to the rules of statutory interpretation.  *See* Pa.R.Crim.P. 101(C) ("To the extent practicable, these rules shall be construed in consonance with the rules of statutory construction.").

reference to the context in which it appears. *See Consulting Eng'rs Council of Pa. v. State Architects Licensure Bd.*, 560 A.2d 1375, 1377 (Pa. 1989). A provision's plain language generally provides the best indication of the drafters' intent. *See*, *e.g.*, *McGrory v. Dep't of Transp.*, 915 A.2d 1155, 1158 (Pa. 2007); *Commonwealth v. Gilmour Mfg. Co.*, 822 A.2d 676, 679 (Pa. 2003); *Pa. Fin. Responsibility Assigned Claims Plan v. English*, 664 A.2d 84, 87 (Pa. 1995) ("Where the words of a statute are clear and free from ambiguity the legislative intent is to be gleaned from those very words."). Only where the words are ambiguous will we resort to other means for discerning legislative intent. 1 Pa.C.S. § 1921(c); *see In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election*, 843 A.2d 1223, 1230 (Pa. 2004) (citing *O'Rourke v. Pa. Dep't of Corr.*, 778 A.2d 1194, 1201 (Pa. 2001) ("Only when the language of the statute is ambiguous does statutory construction become necessary.")).

The plain meaning of the term "any" sheds faint light on whether the rule was intended to allow a prosecutor to demonstrate a *prima facie* case based solely upon otherwise inadmissible hearsay. In the Superior Court's view, "any" reasonably could mean "every" or "all." This is a reasonable interpretation, one that comports generally with dictionary definitions. Merriam-Webster's dictionary defines "any" in a number of ways, including "one or some indiscriminately of whatever kind" and "one, some, or all indiscriminately of whatever quantity."[3]

On the other hand, it would be reasonable as well to interpret "any" in a more restrictive, singular sense. A simple hypothetical will illustrate the point. The setting is a law firm. In an effort to ingratiate himself with his older colleagues, one young associate shows up for work on a Friday with a dozen doughnuts, and sends out an email reading "I brought doughnuts today. Please help yourself to any that you like." Inside the box

---

[3]    *See* https://www.merriam-webster.com/dictionary/any (last visited Aug. 7, 2017).

are three different kinds of doughnuts: glazed, chocolate-sprinkled, and cream-filled. Lawyer A walks up and selects one glazed doughnut, reasonably believing that "any" meant "any one" particular doughnut. However, imagine that Lawyer B was the first to the box, and he decided to take two glazed doughnuts and two chocolate-sprinkled doughnuts. Lawyer B, also reasonably, interpreted "any" to mean "some" or "as many as," because each doughnut fairly can be considered "any" doughnut. The first glazed is "any", as is the second glazed, and as is each of the two chocolate-sprinkled doughnuts. Now, suppose instead that Lawyer C is the first to the box, and that he takes all of the doughnuts. Every one of them is a doughnut that he likes, and there was no limit suggested on the amount of doughnuts that he could take. In fact, he was told that he could take "any" of them. In his view, "any" meant "all," which he happens to know is also the precise meaning ascribed to the term by the Superior Court of Pennsylvania.

Both the Superior Court's interpretation and the above hypothetical demonstrate the interpretive complexities attending the term "any," with its several common usages. Preeminent lexicographer and legal writing maven Bryan Garner, undoubtedly recognizing these complexities and usages, has described the numerous "uses and meanings" of "any" as follows:

> As an adjective, *any* has essentially six uses. (1) The most common occurrence is in conditional, hypothetical, and interrogative sentences, where *any* means "a (no matter which)" or "some" <if you have any salt, I'd like to borrow some> <if any problem were to arise, what would it likely be?> <is there any evidence of the crime?>. (2) In the negative assertions, it creates an emphatic negative, meaning "not at all" or "not even one" <it was not in any way improper> <she did not know any member who was at the event>. (3) In affirmative sentences, it means "every" or "all" <any attempt to flout the law will be punished> <you are required to produce any documents related to the issue>. (4) In a sentence implying that a selection or discretionary act will follow, it may mean "one or more (unspecified things or people); whichever; whatever" <any student may seek a tutorial> <pick any books you like> <a good buy

at any price>. (5) In a declarative sentence or imperative involving a qualitative judgment, it means "of whatever kind" <you'll have to take any action you consider appropriate>. In this sense, there is sometimes the implication that the quality may be poor <any argument is better than no argument>. (6) In a declarative sentence involving a quantitative judgment, it means "unlimited in amount or extent; to whatever extent necessary" <this computer can process any quantity of numbers simultaneously>. In a related colloquial sense, it may mean "of great size or considerable extent" when following a negative <we won't be able to make any real headway this week>.

BRYAN A. GARNER, GARNER'S MODERN ENGLISH USAGE 51 (4th ed. 2016).

"Any," at first blush a simple word, has variable meanings depending upon the context in which the term is used. The problem we face here is that, not only is the term itself amenable to multiple definitions and usages, but the context in which it appears also is unhelpful. The remainder of Rule 542 offers us no guidance as to whether the term "any" was intended to mean "any" in its singular or less than total sense, or whether it was intended to mean one, some, or all. Each construction would be reasonable in this case. Because "[a] statute is ambiguous when there are at least two reasonable interpretations of the text," *A.S. v. Pa. State Police*, 143 A.3d 896, 905-06 (Pa. 2016), Rule 542(E) is ambiguous.

When language is ambiguous, this Court generally may resolve the ambiguity by considering: "the occasion and necessity for the statute or regulation; the circumstances under which it was enacted; the mischief to be remedied; the object to be attained; the former law, if any, including other statutes or regulations upon the same or similar subjects; the consequences of a particular interpretation; and administrative interpretations of such statute." *Freedom Med. Supply, Inc. v. State Farm Fire & Cas. Co.*, 131 A.3d 977, 984 (Pa. 2016) (citing 1 Pa.C.S. § 1921(c)). However, there are additional canons of statutory interpretation that we must consider as well. Relevant

here is our "canon of constitutional avoidance."[4]  We invoked this canon of restraint recently in *Commonwealth v. Veon*, 150 A.3d 435 (Pa. 2016):

> [W]e are bound to interpret a statute, where possible, in a way that comports with the constitution's terms.  1 Pa.C.S. § 1922 (directing us to presume "[t]hat the General Assembly does not intend to violate the Constitution of the United States or of this Commonwealth").  We reach a constitutional challenge only when we find no tenable interpretation of the statute in question that obviates the necessity of doing so.  "When the validity of [a statute] is drawn in question, and if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may be avoided."  *Commonwealth v. Monumental Props., Inc.*, 329 A.2d 812, 827 (Pa. 1974) (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)).  In *MCI WorldCom, Inc. v. Pa. Pub. Utility Comm'n*, 844 A.2d 1239 (Pa. 2004), we explained the governing principle as follows:
>
>> The "canon of constitutional avoidance" provides that when a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter.  *See Harris v. United States*, 536 U.S. 545, 555 (2002). . . .  Pennsylvania explicitly recognizes this canon by statute in instances where construction of a Pennsylvania statute is at issue.  *See* 1 Pa.C.S. § 1922; *see also Commonwealth v. Bavusa*, 832 A.2d 1042, 1050-51 (Pa. 2003).
>
> *MCI WorldCom*, 844 A.2d at 1249-50.

*Veon*, 150 A.3d at 443 (citations modified).

Although "any" is susceptible to myriad interpretations, for purposes of the narrow question at issue in this case, only two are relevant.  The one formulated by the

---

[4]  As detailed below, the lower courts' interpretations of "any" raise considerable due process concerns that necessitate avoidance of an expansive interpretation. Moreover, because the term is ambiguous, the rule of lenity also would apply and would require a more restrictive interpretation of "any."  *See Commonwealth v. Fithian*, 961 A.2d 66, 74 (Pa. 2008) (explaining that, if an ambiguity exists in a penal statute, the ambiguity should be resolved in the light most favorable to the accused).

Superior Court reads "any" to include "every" element of the crimes charged. The other interpretation encompasses something less than every element, whether one element or some, but not all, elements. As we shall see, the former interpretation raises grave due process concerns that render it unsustainable, requiring it to give way to a construction that does not raise the same concerns.

## IV.

## A.

Before addressing these due process concerns, a brief jurisprudential note is in order. The issue upon which this Court granted review is the validity of a *prima facie* case established only by hearsay in light of a criminal defendant's constitutional right to confront and cross-examine witnesses against him or her, a right which traditionally has been confined to the trial setting. *See Pennsylvania v. Richie,* 480 U.S. 39, 52-53 (1987). Indeed, the confrontation right has been the focus of this case from its inception. Nonetheless, in their briefing to this Court, both the Commonwealth and Ricker have determined that due process considerations are integral to a full resolution of the claim, and both parties have asserted expressly to us here that the due process issue is unavoidable.[5] It is rare that opposing parties agree on a fundamental point in a case. Undoubtedly, the parties are more familiar than we are with this case, having been involved with it from its outset. They have determined that consideration of due process issues is necessary for compete disposition of this matter. The Commonwealth has gone so far as to waive expressly any challenge to issue preservation. I would grant the parties' joint request for review.

---

[5] *See* Brief for Ricker at 14, 33-34; Brief for the Commonwealth at 17 n.3 ("The Superior Court found the due process claim unpreserved. As noted by [Ricker], both parties seek review of this claim as well. The [Commonwealth] waives any right to assert that this claim has not been preserved. Resolution of both the Confrontation Clause and due process claim is in the public interest.").

Occasionally, in order to resolve a complicated legal question upon which *allocatur* was granted, we must consider issues beyond those that have been the focus of the lower courts.[6]  This is particularly true for a discretionary court such as ours. Sometimes, the parties recognize that our review and resolution of a discrete legal claim would be hampered without consideration of a separate issue.  And so it is with today's case.  Hence, though uncommon, at times our function necessitates incorporating and addressing additional claims or arguments, such as the due process issue agreed upon by the parties here.

Furthermore, both statutory interpretation and constitutional determinations are questions of law, which allow for *de novo* review.  *See Commonwealth v. Lutz-Morrison*, 143 A.3d 891, 894 (Pa. 2016) (statutory interpretation); *Commonwealth v. Smith*, 131 A.3d 467, 472 (Pa. 2015) (constitutional due process).  Both parties have agreed that the due process issue is indispensable to the ultimate disposition of this case, and both have availed themselves of the opportunity to brief that issue in full.  Accordingly, there are no jurisprudential reasons to abstain from the due process considerations that are implicated in this case.

**B.**

The Due Process Clause of the Fourteenth Amendment to the United States Constitution prevents states from depriving "any person of life, liberty, or property,

---

[6]  At times, this Court identifies such issues, and directs the parties to include them in their presentations to this Court.  By way of example, consider our recent grant of *allocatur* in *Commonwealth v. Livingstone*, 135 A.3d 1016 (Pa. 2016) (*per curiam*), where, in order to consider a police seizure of a vehicle for purposes of rendering aid, we directed the parties to brief and to argue the potential application of the community caretaker doctrine, even though the issue had not been part of the lower courts' analysis and even though neither party requested consideration of that issue.

without due process of law . . . ." U.S. CONST. amend XIV, § 1. [7] In addition to incorporating specific provisions of the Bill of Rights to the states and providing certain substantive rights, the clause generally serves to protect individuals from processes and procedures so unfair that they offend "fundamental conceptions of justice," *Dowling v. United States*, 493 U.S. 342, 352 (1990) (quoting *United States v. Lovasco*, 431 U.S. 783, 790 (1977)), and to uphold traditional notions of fundamental fairness and ordered liberty. *Id.*[8]

In his oft-quoted concurrence in *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123 (1951), Justice Felix Frankfurter remarked upon the role that due process plays in safeguarding fairness for those involved in the judicial system, noting that "[f]airness of procedure is due process in the primary sense. It is ingrained in our national traditions and is designed to maintain them." *Id.* at 161 (Frankfurter, J., concurring) (internal citation and quotation marks omitted). Justice Frankfurter then offered the following historical quote from *Hagar v. Reclamation Dist., No. 108*, 111 U.S. 701, 708 (1884): "(B)y 'due process' is meant one which, following the forms of law, is

---

[7] The Due Process Clause generally encompasses two species of protection. The first category, known as substantive due process, applies to those rights "created only by the Constitution," *see Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 229 (1985), and "specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (citations and internal quotation marks omitted). The second category is procedural due process, which embodies the notion that "[p]arties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (quoting *Baldwin v. Hale*, 1 Wall. 223, 233 (1863)). In today's case, only procedural due process is at issue.

[8] As noted *infra*, though broad on its face, procedural due process is not a device for imposing substantive or normative notions of just results. *See e.g. Dowling* 493 U.S. at 352 ("Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation.").

appropriate to the case, and just to the parties to be affected. It must be pursued in the ordinary mode prescribed by the law; it must be adapted to the end to be attained; and wherever it is necessary for the protection of the parties, it must give them an opportunity to be heard respecting the justice of the judgment sought." *Joint Anti-Fascist Refugee Comm.*, 341 U.S. at 162 (Frankfurter, J., concurring). Finally, Justice Frankfurter offered the following insight upon the place of due process in a system of ordered justice:

> The requirement of 'due process' is not a fair-weather or timid assurance. It must be respected in periods of calm and in times of trouble; it protects aliens as well as citizens. But 'due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. Expressing as it does in its ultimate analysis respect enforced by law for that feeling of just treatment which has been evolved through centuries of Anglo-American constitutional history and civilization, 'due process' cannot be imprisoned within the treacherous limits of any formula. Representing a profound attitude of fairness between man and man, and more particularly between the individual and government, 'due process' is compounded of history, reason, the past course of decisions, and stout confidence in the strength of the democratic faith which we profess. Due process is not a mechanical instrument. It is not a yardstick. It is a process. It is a delicate process of adjustment inescapably involving the exercise of judgment by those whom the Constitution entrusted with the unfolding of the process.
>
>           *         *         *
>
> Due process is perhaps the most majestic concept in our whole constitutional system. While it contains the garnered wisdom of the past in assuring fundamental justice, it is also a living principle not confined to past instances.

*Id.* at 162-63, 174.[9]

---

[9] *See also Malinski v. New York*, 324 U.S. 401, 414 (1945) (Frankfurter, J., concurring) ("The history of American freedom is, in no small measure, the history of procedure."); and *McNabb v. United States*, 318 U.S. 332, 347 (1943) (Frankfurter, J., concurring) ("The history of liberty has largely been the history of observance of procedural safeguards.").

Notwithstanding the constitutional dimensions of "fundamental fairness," its scope has not been unbounded, and the principle is not simply a catch-all repository allowing resort to sundry invocations of fairness when no lawful remedy exists. In *Lovasco*, the Supreme Court emphasized the limitation as follows:

> Judges are not free, in defining "due process," to impose on law enforcement officials [their] "personal and private notions" of fairness and to "disregard the limits that bind judges in their judicial function." *Rochin v. California*, 342 U.S. 165, 170 (1952). . . . [They] are to determine only whether the action complained of . . . violates those "fundamental conceptions of justice which lie at the base of our civil and political institutions," *Mooney v. Holohan*, 294 U.S. 103, 112 (1935), and which define "the community's sense of fair play and decency," *Rochin*, 342 U.S. at 173.

*Lovasco*, 431 U.S. at 790 (citations modified).

Still, while bounded by principles of restraint, procedural due process nonetheless provides important protections to criminal defendants, largely to ensure the fairness of proceedings. In the pretrial stage, procedural due process provides a litany of protections, as summarized by Professor Wayne LaFave and his colleagues in their treatise on criminal procedure:

> At the investigatory stage, due process restricts the state's utilization of lineups, showups, and other identification procedures insofar as they present a "substantial likelihood of irreparable misidentification," prohibits police practices that are so "outrageous" as to "shock the conscience," and mandates against the intentional destruction or failure to preserve evidence recognized to be exculpatory and actions directed at making it more difficult for the defendant to locate potentially favorable witnesses. At the charging stage, due process prohibits unjustified extensive delay in charging that results in prejudice to the defense in preparing its case and charges that are the product of prosecutorial vindictiveness. At the pretrial stage, due process governs procedural elements of the motion to suppress, ensures that the defense receives reciprocal discovery when it is required to provide discovery to the prosecution, provides the indigent defendant with access to experts as needed to evaluate and present a contention resting on scientific expertise (*e.g.*, insanity), recognizes a defense right to obtain during pretrial discovery governmental records determined by the trial court to contain material exculpatory information,

imposes on the prosecution a duty to disclose to the defense or court material exculpatory evidence that is within its possession or control, and prohibits state timing requirements for motions that are so stringent as to deny the defendant a reasonable opportunity to raise a constitutional objection.

1 WAYNE R. LAFAVE ET AL., Criminal Procedure § 2.7(a) (4th ed. 2015) (footnotes and citations omitted).

It is indisputable that neither the United States Constitution nor the Pennsylvania Constitution requires a preliminary hearing. This does not mean that, once afforded, the hearing lies outside the scope of due process protections. To date, neither the United States Supreme Court nor this Court has defined the protections demanded by due process when the Commonwealth proceeds with a preliminary hearing, at least not with regard to the quantity of admissible evidence that the Commonwealth must advance in order to support a magisterial district judge's decision to bind a defendant over for trial. We approached the question in *Commonwealth ex rel. Buchanan v. Verbonitz*, 581 A.2d 172 (Pa. 1990) (plurality). In that case, five Justices held that the due process implications attendant to any adjudicative proceeding attach as well to preliminary hearings.

On its face, *Verbonitz* is a plurality decision. Closer inspection reveals that a majority of the Court would have held that constitutional principles of due process apply, at least to some degree, at preliminary hearings. Justice Larsen authored the lead opinion, which was joined by Justices Zappala and Papadakos. Justice Larsen noted that, to satisfy its *prima facie* burden, "the Commonwealth must produce legally competent evidence . . . ." *Id.* at 174. He then continued:

> In this case it is clear that the Commonwealth did not meet its burden. As Justice Flaherty stated in his concurring opinion in *Unemployment Compensation Board of Review v. Ceja*, 427 A.2d 631, 647 (Pa. 1981) (Flaherty, J., concurring), "**fundamental due process** requires that no adjudication be based solely on hearsay evidence". If more than "rank

hearsay," *id.,* is required in an administrative context, the standard must be higher in a criminal proceeding where a person may be deprived of his liberty.

*Id.* (citation modified; emphasis added).

Similarly, Justice Flaherty, joined by Justice Cappy, acknowledged that there is no constitutional right to a preliminary hearing. However, he noted that, when, by law, a state creates a hearing, certain rights, such as the right to counsel and possibly the right to confront witnesses, necessarily attach. Justice Flaherty then addressed directly the question of whether hearsay "standing alone" may constitute sufficient evidence for a *prima facie* case; unequivocally, he would have held that such evidence was insufficient. *Id.* at 175 (Flaherty, J., concurring) (emphasis omitted). Justice Flaherty deemed "this to be a requirement of due process," *id.*, and reiterated his pronouncement in *Ceja* that "[f]undamental due process requires that no adjudication be based solely on hearsay evidence." *Id.* at 176 (quoting *Ceja*, 427 A.23 at 547 (Flaherty, J., concurring)).

In the case *sub judice*, the Superior Court effectively buried *Verbonitz* as a valueless plurality. This was a parched interpretation. In *Verbonitz*, five Justices of this Court agreed that, to some degree, constitutional due process attaches at a preliminary hearing and prohibits cases from being bound over for trial based solely upon hearsay. Far from lacking persuasive value, the *Verbonitz* opinions should together be recognized as a holding that due process prohibits the Commonwealth from depriving a person of liberty upon nothing more than inadmissible hearsay. A hearing premised only on hearsay cannot comport with any reasonable understanding of "fundamental conceptions of justice" or 'the community's sense of fair play and decency." *Lovasco*, 431 U.S. at 790.

**C.**

For a *prima facie* case to rest upon nothing more than inadmissible hearsay is to offend traditional notions of procedural due process. At such an illusory proceeding, the interests, purposes, rights, and benefits of a preliminary hearing are denuded of substance or meaning.

Although not constitutionally mandated, a preliminary hearing, once established, plays a vital role in our criminal justice system. For all parties involved, it serves a core function, and it protects against unwarranted governmental intrusions upon a citizen's liberty. "The primary reason for the preliminary hearing is to protect an individual's right against unlawful arrest and detention." *Commonwealth ex rel. Maisenhelder v. Rundle*, 198 A.2d 565, 567 (Pa. 1964). Additionally, the hearing "seeks to prevent a person from being imprisoned or required to enter bail for a crime which was never committed, or for a crime with which there is no evidence of his connection." *Id.*

In *Coleman v. Alabama*, the United States Supreme Court described the role of counsel at the preliminary hearing. In determining that such a proceeding, when afforded by state law, is a critical stage of the criminal justice system at which the right to counsel attaches, the Court explained that the preliminary hearing may serve to prevent "erroneous or improper prosecution." *Coleman*, 399 U.S. at 9. The Court described defense counsel's functions at the hearing as follows:

> First, the lawyer's skilled examination and cross-examination of witnesses may expose fatal weaknesses in the State's case that may lead the magistrate to refuse to bind the accused over. Second, in any event, the skilled interrogation of witnesses by an experienced lawyer can fashion a vital impeachment tool for use in cross-examination of the State's witnesses at the trial, or preserve testimony favorable to the accused of a witness who does not appear at the trial. Third, trained counsel can more effectively discover the case the state has against his client and make possible the preparation of a proper defense to meet that case at the trial. Fourth, counsel can also be influential at the preliminary hearing in making effective arguments for the accused on such matters as the necessity for an early psychiatric examination or bail.

*Id.*

Although the panoply of constitutionally provided trial rights does not apply in its entirety at a preliminary hearing, the hearing clearly is intended to be more than a mere formality. The very rule that we are called upon to interpret provides a right to counsel and to cross-examine witnesses. The rule further provides the accused with the right to inspect the evidence offered by the Commonwealth.

The preliminary hearing was not created for the purpose of serving as a trial preparation tool for the defense. *See Commonwealth v. Sanchez*, 82 A.3d 943, 984 (Pa. 2013). This does not mean that no benefits necessarily and naturally accrue to the defendant in conducting the hearing according to its true purpose and within the confines of our Constitutions. A true preliminary hearing involves introduction by the Commonwealth of the minimum competent evidence to establish a *prima facie* case. In doing so, the Commonwealth opens its case to preliminary inspection and subjects its witnesses to basic cross-examination. Each is necessary to convince the presiding judicial officer that the Commonwealth's restraint upon the accused's liberty is warranted. As noted in *Coleman*, this allows the accused and his counsel to probe the testimony, to make arguments against the charges or in favor of bail, and to preserve favorable testimony. It also serves as a limited discovery tool, which can inform decisions on whether to challenge the seizure of the accused or the acquisition of evidence in a suppression motion, and on what defense to pursue, if any. Moreover, the ability to participate fully in a preliminary hearing can aid in focusing subsequent expenditures of limited investigative resources, something that is particularly beneficial to chronically (and unlawfully) underfunded public defender's offices. *See Kuren v. Luzerne Cty.*, 146 A.3d 715, 717 (Pa. 2016).

Inevitably, the protocol that would ensue if due process tolerated *prima facie* cases premised upon hearsay alone would typically allow a prosecutor merely to call a police officer to the witness stand to read reports and summaries of interviews to the magisterial district judge. The officer would not even be required to have any involvement in the case. In busy cities like Philadelphia and Pittsburgh, the Commonwealth could install one police officer in each criminal courtroom and simply have that officer read the reports as the cases are called, with no requirement of prior familiarity with any case. Under such a protocol, the right to counsel and the rule-based right to cross-examine witnesses would amount to nothing more than hollow formalities, promises broken. Counsel's functions, as outlined by the Supreme Court in *Coleman*, would cease to exist. There would be no ability to test the Commonwealth's *prima facie* case, no witnesses to cross-examine, no testimony to preserve. Counsel would not be able to identify weaknesses in the Commonwealth's case or to identify possible defenses, as counsel would have no reason to be confident that the statements read by police officers accurately or fully reflect what the witness would say on the witness stand at trial. The right to counsel, and counsel's concomitant rule-based right to cross-examine witnesses, would shrink to a right merely to have a warm body stand next to the accused, incapable of serving any real function on the accused's behalf.

Additionally, the accused would be deprived of the other benefits that flow from participating in a preliminary hearing, such as obtaining a fair idea of the case against him or her and being able to allocate resources accordingly. At the same time, the Commonwealth would benefit from shielding its case and its witnesses from testing and examination, and would be permitted to proceed on little more than its assurance that it will produce competent evidence at some later date.

Perhaps as importantly, the presiding magistrate would be unable to perform his or her function. That judicial officer must evaluate the Commonwealth's case and be convinced that the Commonwealth's charges are justified and that the Commonwealth's evidence warrants subjecting the accused to a full trial. If a magisterial district judge renders a decision based exclusively upon evidence that cannot be used against the accused at a later trial, no confidence can be ascribed to that decision. In principle, the justification for the Commonwealth's charges would be no different than if the prosecutor had looked up to the judicial officer and said "trust me, we can prove this case later." No restraint upon a person's liberty can rest upon such a premise.

As a flexible concept, due process is necessarily incapable of precise definition. However, by any definition, principles of fundamental fairness and ordered liberty demand minimally that, when the law affords an individual a hearing, particularly one where restraint of a person's liberty interest is at issue, that hearing cannot be a functionless formality, nor entirely one-sided. Our Constitutions and our laws identify rights and interests that play an important role in the preliminary hearing. When the Commonwealth is permitted to circumvent each of those rights and interests by introducing only evidence that cannot be introduced at trial, and nothing more, that hearing falls well below the line that due process draws. Nothing about such a hearing satisfies 'the community's sense of fair play and decency." *Lovasco*, 431 U.S. at 790.

When the law affords a hearing to a person involved in our judicial system, particularly a hearing in which that person's liberty is at stake, the hearing must be more than a mere formality. In the words of Justice Benjamin Cardozo, "[t]he hearing, moreover, must be a real one, not a sham or a pretense." *Palko v. State of Connecticut*, 302 U.S. 319, 327 (1937) (citations omitted) (*overruled by Benton v.*

*Maryland*, 395 U.S. 784, 794 (1969) (holding that the Due Process Clause required incorporation of the Fifth Amendment's Double Jeopardy Clause to the states)).

**V.**

Because a *prima facie* case that rests exclusively upon hearsay would violate constitutional due process requirements, any interpretation of Rule 542(E) that permits such a result also is unconstitutional. As such, the Superior Court's interpretation must be avoided. *See Veon*, 150 A.3d at 443. The ambiguity that surrounds Rule 542(E)'s use of the term "any" must be resolved in favor of Ricker. The term cannot mean "all."

The issue in this case only requires consideration of whether "any" can mean "all." Beyond that, the question of what portion of a *prima facie* case can rest upon hearsay is not before the Court. The Criminal Procedural Rules Committee, comprised of judges, prosecutors, and defense lawyers, should consider that question in the first instance and in light of today's result. Those additional considerations are not before the Court, and should be reviewed in short order by the Committee.

For purposes of the present case, Ricker did not receive a preliminary hearing in accordance with the manner required by due process. The Superior Court's decision to the contrary must be reversed, and Ricker must be afforded a new preliminary hearing.